# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

|                                                              |     |                          |
| ------------------------------------------------------------ | --- | ------------------------ |
| **C.R.K., AN INFANT, BY AND THROUGH HER NATURAL GUARDIAN AND NEXT FRIEND, A.L.K.,** | )   |                          |
|                                                              | )   |                          |
| **Plaintiff,**                                               | )   |                          |
|                                                              | )   |                          |
| **v.**                                                       | )   | Case No. **6:22-CV-06138-MDH** |
|                                                              | )   |                          |
| **SCHOOL DISTRICT OF SPRINGFIELD, R-12; ANDRE ILLIG; AND SARAH ODOM,** | )   |                          |
|                                                              | )   |                          |
| **Defendants.**                                              | )   |                          |

## ORDER

Before the Court is Defendants' Motion for Summary Judgment. (Doc. 92). Defendants move for summary judgment on all counts in Plaintiff's Complaint. Plaintiff C.R.K., a minor proceeding through her next friend, filed this action against the School District of Springfield, R-12 ("SPS"), Principal Andre Illig, and Assistant Principal Sarah Odom. Plaintiff asserts federal constitutional claims under 42 U.S.C. § 1983 for free speech retaliation (Count IV), denial of equal protection (Count V), and denial of substantive due process (Count VI) against Illig and Odom in their individual capacities. Plaintiff also brings state law claims under the Missouri Human Rights Act ("MHRA"), RSMo. § 213.010 et seq., alleging hostile educational environment (Count I), disparate treatment (Count II), and retaliation (Count III) against all Defendants.

Defendants seek summary judgment on all counts, arguing that Plaintiff cannot establish the essential elements of her federal or state claims, that the record demonstrates legitimate, nondiscriminatory reasons for the decisions at issue, and that Illig and Odom are entitled to qualified immunity on the constitutional claims. Plaintiff opposes the motion, contending that genuine disputes of material fact remain for trial.

After considering the record and viewing all evidence in a light most favorable to Plaintiff, the Court finds Defendants are entitled to judgment as a matter of law. Therefore, summary judgment on all counts is **GRANTED**.

## BACKGROUND

Plaintiff, who is Black, was a student at Cherokee Middle School, a secondary school within the School District of Springfield R-12 ("SPS"). During the 2020-2021 school year, Plaintiff was in seventh grade at Cherokee Middle School. At all relevant times to Plaintiff's complaint, Andre Illig ("Illig") was the Principal of Cherokee Middle School, Sarah Odom ("Odom") was the Assistant Principal, and Dr. Sheila Wynn ("Dr. Wynn") was the Director of Secondary Schools for SPS.

Due to the COVID pandemic, after spring break 2020, through the end of that school year, all SPS students attended all school days virtually through a learning platform called "Canvas." At the beginning of the 2020-2021 school year, students were to return to seated learning two days per week and have a virtual classroom day on Wednesday through the learning platform Canvas with the rest of their class. If during the 2020-2021 school year a student needed to be absent and quarantined due to COVID, the student would continue to have access to their schoolwork through Canvas, but this was to occur on a "short-term" basis of ten days or less and was not a full-time virtual option for students. During any period of quarantine, a student did not receive special instruction from their teacher and would be expected to follow Canvas, review their assignments, and complete the assignments.

 Parents who did not want their student to return to any seated learning at the start of the 2020-2021 school year had the option of "full-time K-12 virtual services" through a separate school or separate program from the "on-building" programs called "Launch." Launch was a

2

separate school from seated learning and its companion learning platform Canvas. Students were not working on what was occurring in the seated classroom within their regular school. Launch teachers were separate and independent from a student's teachers at their regularly assigned school. Illig did not have supervisory authority over Launch. The program was instead under the authority of the Director of Secondary Schools, Dr. Wynn.

Plaintiff and her mother A.L.K. chose for Plaintiff to return to seated learning for the 2020-2021 school year two days per week, and three virtual classroom days through Canvas with the rest of her class.

As of November 9, 2020, all students, including Plaintiff, were to return to seated learning four days per week with one virtual classroom day through Canvas. Parents could switch their student from seated learning/Canvas to Launch for the remainder of the 2020-2021 school year provided that they made that election between November 10 and November 17, 2020. Plaintiff did not make that election. When the fourth quarter began on March 22, 2021, students, including Plaintiff, were to return to full-time seated learning. However, Defendants made some exceptions to this requirement.

As part of the Canvas learning platform, students received a computer called a "Chromebook." Plaintiff's Chromebook from SPS provided her access to her school accounts, her schoolwork, her assignments, and the assignment due dates. Plaintiff was able to communicate with her teachers, take tests, turn in assignments, and complete her daily work using her Chromebook. She was able to complete and turn in assignments using her Chromebook even on days she was absent from school. Plaintiff did not always complete and turn in assignments and homework even on days that she was present in school.

**Discriminatory Conduct**

During the 2020-2021 school year, white students at Cherokee Middle School regularly shouted racially discriminatory statements in the hallway. Students J.B. and D.B. made such comments to Plaintiff, told her to "go back to the cotton field," and called her the "N word." J.B. and D.B. also made comments such as "white power" and "Trump 2020." Once J.B. got down on one knee and held up the Black Lives Matter sign. Plaintiff did not report the comments because she did not want other students, who were friends with J.B. and D.B, to find out she complained, but those other students never said anything inappropriate to Plaintiff directly.

On Sunday, April 18, 2021, outside of school hours, Plaintiff attended a "group FaceTime" call with two girls, and four boys. During the call two of the boys "were very mean" to the other two girls. They told one she was Filipino or Chinese, "to go eat bats and that she's the one that started the whole COVID pandemic," and that they supported "Asian hate." Plaintiff "chimed in" to "stick up" for the girls and one boy "started saying the N word and all of the stuff that [she'd] already been hearing at school, but nothing like that was just straightforward about [her]." One of the boys told Plaintiff to "go slit your wrists;" one stated to the other girl "I bet you're fat, you're ugly;" another stated to Plaintiff and one girl, "go back to the cotton fields," one boy was saying the "N word." Plaintiff later told her mother, A.L.K., about the group FaceTime call and alleged to her mother other things that were happening at school. A.L.K. also overheard the group FaceTime call.

**Informing Defendants of Discriminatory Conduct**

On April 19, 2021, A.L.K. went to Plaintiff's school and discussed the call she overheard with Odom and what she described as "racial discrimination" that Plaintiff was experiencing.

Odom told A.L.K. that an issue of a racial nature in the school had come to the attention of the office back in January 2021. The school was able to address and get it to stop. [1] Per Odom, the issues brought forward in January 2021 were by teachers, not students. The teachers believed that they needed to be addressed but indicated to Odom specific comments being made by one specific student to another specific student could not be determined. The teachers were not able to determine exactly which student was making inappropriate comments because students were wearing masks due to the COVID mask mandate.

The January 2021 concerns were addressed through monthly advisory meetings with students. These meetings initially occurred at the beginning of the school year and then monthly thereafter touching upon appropriate and inappropriate school conduct. Individual discussions with students also occurred. Illig implemented the advisory meeting program, and he created the associated slides that were used when presenting the information to the students. During the January 2021 advisory meeting, students were reminded that they should never use words of a racial nature. During the February 2021 advisory meeting, Illig updated the slides to be more explicit regarding students not using racial terms, in any context or form, to prevent such from occurring, and told students that there would be severe discipline issued to students who did so. Illig oversaw Odom and considered her the primary disciplinarian and the one to investigate specific concerns. Illig would be consulted as needed depending on the severity of the issue at dispute.

---

[1] Plaintiff attempts to create a factual dispute by asserting that Cherokee administration also had knowledge of specific reports of racially discriminatory conduct that continued throughout the year. It is not disputed that Defendants received specific reports of racially discriminatory conduct. To the extent the parties disagree on the number of reports received, that is immaterial. The record reflects that Defendants followed up on reports. Additionally, none of those reports concerned or involved Plaintiff.

Odom informed Illig about the allegations that A.L.K. brought to her on April 19, 2021, regarding Plaintiff. In response to A.L.K.'s discussion with Odom on April 19, 2021, Odom told A.L.K. that Plaintiff needed to email Odom a written statement with specifics about what had occurred and the issues. Odom needed a written statement from Plaintiff because she needed to know when things were said and where they were said to determine how to investigate them and if they were happening at school or solely on social media and if she had jurisdiction to investigate. A.L.K. also requested Plaintiff transfer from seated learning to virtual learning. During their meeting, Odom and A.L.K. discussed the possibility of virtual schooling. Odom told A.L.K. that she would need to discuss that with Illig.

On April 23, 2021, Plaintiff emailed screenshots from her phone's notes app to Odom, and she identified the individuals that attended the group FaceTime call and a general list of the comments that had allegedly been made during the call. On April 23, 2021, Odom replied to Plaintiff's email and told Plaintiff that she needed as much information as possible and asked Plaintiff to be more specific about when and where these things had been said (for example, 'the "N-word" was said by so-and-so in the hallway between 2nd and 3rd period…').

On April 25, 2021, at 8:16 pm, A.L.K. forwarded new information from an Instagram account to Odom. Plaintiff was unaware that A.L.K. emailed the Instagram account information to Odom and prior to her deposition, had not seen A.L.K.'s April 25 email to Odom. The Instagram account was titled "exposing [C.R.K.]."[2] The Instagram account reposted a video of Plaintiff and her friend. Plaintiff claims in her Complaint that a student at Cherokee Middle School created the

---

[2]The parties dispute Plaintiff's understanding of the account title. Defendants claim Plaintiff does not understand that title to mean that she was exposed for anything that she did. Plaintiff contends that she did not say she did not understand that title to mean that she was exposed for something she did, rather she did not have an understanding of what she could have done that the account would be exposing. This fact is immaterial as the importance of the account is whether it was created at school or with school property.

6

video and did so "to mock Plaintiff." However, Plaintiff admitted creating the video on her phone on April 12, 2021, using TikTok, while at the home of another student, A.D. Plaintiff and A.D. were "being silly making a video." The video rotates images of two boy students in the background. As the video progresses Plaintiff dances across the screen over each boy. Plaintiff downloaded the video from TikTok and shared it with four other girls. Within a week of the video being posted on Instagram, Plaintiff replied to the Instagram account and "went with the joke" although she now contends she did not know what the joke was or what the joke was about. Plaintiff does not know who created the Instagram account or who posted the video.

At 9:19 am on April 26, 2021, after receiving the email from A.L.K. with the Instagram account information, Odom replied to A.L.K., and told A.L.K. that "anything that happens outside of school needs to be reported to the police…we are legally limited on what we are allowed to address." In a later email at 11:06 am on April 26, 2021, Odom told A.L.K. that if she heard of or suspected a certain student to let her know, and she could have SPS run a search to try and determine if the Instagram account was created on a school device. In her 9:19 am email on April 26, 2021, Odom also told A.L.K. that she understood the incident that A.L.K. described on April 19, 2021, involving the group FaceTime call, occurred on a weekend and she could not investigate that on her end given it did not occur at school.[3] In her 9:19 am on April 26, 2021, Odom also told A.L.K. that she understood Plaintiff was going to provide a statement with incidents that had

---

[3] The FaceTime call did not occur at school, on the bus, or a school event. There is no evidence that the Instagram account was created at school, or through school provided property. Plaintiff cites *Plaintiff A v. Park High Sch. Dist.*, No. 21-cv-6153- SRB, 2022 U.S. Dist. LEXIS 22083, at *12 (W.D. Mo. Feb. 8, 2022) (citing Mahanoy Area Sch. Dist. v. B.L., 594 U.S. 180 (2021)). In *Park Hill Sch. Dist.*, students were traveling on school buses to a football game, and students on one bus sent Snapchat messages to a student on another bus. A student on the first bus then drafted a petition on Change.org titled "Start slavery again," showed the petition to students seated near him who encouraged him to post it, and he did prior to arriving at the game. Because the conduct took place during a school event the school district issued suspensions. The court held that because the petition substantially interrupted the school environment, the suspensions did not violate the students' due process rights. Here, the FaceTime call did not occur at school, on the bus, or at a school event, nor is there evidence that the Instagram account was created at school, or through school-provided property. *Park Hill Sch. Dist.* is inapplicable to the facts of this case and does not make this fact material.

happened at school. At 10:14 am on April 26, 2021, Plaintiff replied to Odom's April 23 email stating:

> Thank you! So whenever I walk into CSIM Class (first period) D.B. will say "go back to the fields cotton picker." J.M. is one of my good friends and she is in the class also and I know D.B. says it to her too. Now for the N word and etc, it honestly just depends were you are I hear it at lunch the most. I don't have specific people but that's all the information I know that happens in school. Hopefully this information helps in someway. Thanks!

In her April 26 email to Odom, Plaintiff did not go into full detail because she was scared of the "repercussions" meaning hearing stuff from other kids at school, but she never said that to Odom or anyone else at Cherokee. The only individuals that knew what was happening at school were the other people that were also getting antagonized, but Plaintiff could not identify others for Odom because she does not remember who those individuals were.

Odom investigated the concerns that Plaintiff provided in her email on April 26, 2021. Student J.M., who was Bi-racial, told Odom that no one ever used racially insensitive terms or called her names. Student D.B., who was African American, denied that he said, "go back to the fields cotton picker."

The only information that Plaintiff relayed to Odom was contained in the two emails to Odom dated April 23 and 26, 2021. Prior to April 23, 2021, Plaintiff had not provided or sent any information or relayed any concern to Odom. Plaintiff did not attend school in person after April 14, 2021. Plaintiff did not report anything to Illig and did not recall if she reported anything to any teacher or counselor at Cherokee.

Defendants received nineteen (19) written reports of racial discrimination at Cherokee between November 2019 and April 2021, including six (6) after January 2021. None involved Plaintiff. Defendants' response to reports of race discrimination at Cherokee did not always

8

include taking written statements from students. However, Odom contends she followed up on reports regardless of whether a student provided a written statement. From November 2019 – April 2021 twelve students received discipline arising out of fourteen incidents for "racial discrimination, retaliation, or denial of a constitutional right."

**Learning Platform Transfers**

"Homebound" is a separate virtual learning school/program for students with medical issues provided by SPS through its health services department. Requests for Homebound schooling are to be presented to a school's nurse who reports to the Health Services Department. Homebound is for students with medical issues with focus on a couple of core classes designed to ease the burden on the student in order for them to continue their education while healing.

Decisions regarding whether a student could transfer to Homebound schooling were made by the Director of Health Services for SPS. Conversely, Dr. Wynn, as Director of Secondary Schools, in conjunction with input from her supervisor Dr. Ronald Woodard, Executive Director, made the decision as to whether secondary students could transfer from seated learning to Launch, or from Launch to seated learning.

In making the decision as to whether a student could transfer from seated learning to Launch, Dr. Wynn would gather information to make a determination she believed was in the best interests of the student. Dr. Wynn considered both information she gathered and that was provided to her. She would also speak with administrators at the student's building. She contends her determination was dependent on the particular situation. For example, she considered what grade the student was in, the time in the school year when the request was made, and the past educational success and performance of the student. Dr. Wynn considered these factors in order to determine

9

what was in the best interest of the student. Requests for transfer during the fourth quarter were subject to stricter scrutiny because, per Dr. Wynn, it was more difficult for students to successfully transfer later in the fourth quarter. Launch students were typically assigned no new schoolwork during the latter part of the fourth quarter.

During the fourth quarter of the 2020-2021 school year, 46 secondary students at SPS either appealed their seated learning requirement or requested to transfer to Launch or Homebound. [4] When a student "appealed their seated learning requirement" it meant that the student was not successful in Launch and was being required by SPS to transfer from Launch to seated learning. Of the 46 students requesting transfer during the fourth quarter, 20 appealed their seated learning requirement or sought transfer from seated learning to Launch, and 26 requested Homebound. Of the 20 students appealing their seated learning requirement or seeking transfer to Launch, Dr. Wynn approved 11 of those, which included transfer approvals for both minority and non-minority students. She denied 9 of those, which included transfer denials for both minority and non-minority students. Dr. Wynn denied Plaintiff's transfer request in addition to these.

By early April 2021, Dr. Wynn communicated to staff that secondary students would rarely be allowed to transfer to Launch because such transitions later in the fourth quarter would be difficult for students. Of the 20 fourth quarter Launch transfer requests, 8 were denied because the student had previously failed in Launch (5 white students and 3 minority students). As for the remaining 12 requests, except for student A.L.[5] (white), all were granted (7 white students and 4

_____

[4] Plaintiff asserts the total is 45 students. While the total is 45, because one student (student AC) both (1) appealed the seated learning requirement and (2) requested transfer to Homebound, the total number of students requesting one or the other is 46.

[5] Student A.L. (white) sought transfer from seated learning to Launch due to bullying and then to Homebound. Although that student's request was as early as March 25, 2021, just four days into the fourth quarter, it was denied. Like Plaintiff, Homebound was a virtual option for student A.L. But student A.L.'s request was denied because an application was not received.

minority students). 7 out of 13 (54%) white student fourth quarter transfers were granted based on extenuating circumstances and 4 out of 7 (57%) minority student fourth quarter transfers were granted. After April 1, 2021, only 3 transfers were granted. Two of those transfers, including one white student and one Hispanic-Latino student, were granted transfer on April 7, 2021. After that date, only one transfer request was granted on April 12, 2021, for a Bi-Racial student, student X.L. All allowed fourth quarter Launch transfers occurred in the first three weeks and one day into the fourth quarter. No transfer from seated learning to Launch occurred during the last six weeks and four days of school. After April 12, 2021, any secondary student who requested to transfer to virtual learning was only allowed to transfer to Homebound. Plaintiff is the only student who requested to transfer to Launch after April 12, 2021.

Odom discussed A.L.K.'s request for Plaintiff to transfer from seated learning to virtual learning with Illig and he suggested that Odom speak with Dr. Wynn. Odom telephoned Dr. Wynn to discuss A.L.K.'s request for Plaintiff to transfer to virtual learning. Dr. Wynn told Odom that Plaintiff could not transfer to Launch due to the lateness in the school year, meaning the middle of fourth quarter. Dr. Wynn and Odom also discussed that because Plaintiff was seeing a physician that Homebound was a possible virtual option for Plaintiff. Odom and Illig only referred parents to Health Services concerning Homebound learning. They neither participated in determining whether a student was approved for or provided Homebound learning.

Three days after their conversation about racial discrimination, on April 22, 2021, Odom called A.L.K. and told her that per Dr. Wynn, Plaintiff could seek enrollment in the Homebound learning program and that medical documentation was required. On April 23, 2021, Plaintiff's physician provided a letter to the school, stating that Plaintiff needed to complete the school year in virtual studies. On April 27, 2021, A.L.K. emailed Odom stating she had not received

information from Health Services about Homebound and Odom told A.L.K. that she would follow up with the nurse's office in that regard. Odom contacted the nurse's office on April 27, 2021, and was told that the Homebound Instruction sheet had been faxed to Plaintiff's physician's office that day, that it would need to be completed by the physician and approved by Health Services, and that the nurse would contact A.L.K. and let her know. When Plaintiff's physician later called A.L.K. and told her that the school needed additional information to complete the Homebound enrollment, A.L.K. gave Plaintiff's physician permission to provide that information. Plaintiff's physician submitted the required documentation on the Homebound Instruction sheet and faxed it to SPS the afternoon of April 29, 2021.

Health Services approved Plaintiff for Homebound learning on May 5, 2021, 12 days after submission, and Plaintiff was assigned a teacher. Plaintiff started Homebound instruction on May 6, 2021. In 2021 it took 17 days for a white student's request to be approved. Plaintiff's request was approved in 12 days. The time period for approval of a request can run between several days and several weeks.

While in Homebound, a student usually gets supported in two subject areas, English and Math, because those are the primary tested subjects. As part of Homebound, Plaintiff was still enrolled at Cherokee and her teachers would communicate with the Homebound teacher as to the classes that were being focused on. Plaintiff was excused from all regular classroom assignments after her last day of seated learning, April 15, 2021. Plaintiff continued to have her Chromebook, and she could login to her school account and see her assignments. While in Homebound, she chose to complete certain assignments for certain classes, such as Health, although she was excused from those assignments after April 14, 2021. Plaintiff's science teacher provided her with instruction as to previously assigned schoolwork that Plaintiff could complete to raise her grade

12

should Plaintiff choose to do so. Plaintiff chose not to do those assignments. Had she completed just one of her prior science assignments she would have raised her grade above failing.

Plaintiff claims that her Homebound was inadequate because she did not have access to the same lessons as her classmates. When starting Homebound, Plaintiff was failing English and had a D in Math. She ended the schoolyear with a C in English and a B in Math.

For the 2021-2022 school year, Plaintiff moved to Branson, Missouri and attended eighth grade at Branson Junior High School. Plaintiff liked attending eighth grade in Branson, enjoyed her time there, and was well-adjusted and enjoying school. Plaintiff returned to Springfield, Missouri following her eighth-grade year and attended nineth grade at Parkview High School. At the time of her deposition, December 2023, Plaintiff was in tenth grade, attending Parkview High School. Plaintiff likes attending Parkview High School and describes Parkview as a "nice school." Plaintiff's mother A.L.K. has had no concerns with Plaintiff's grades while at Branson Junior High or at Parkview High School except for Math which she described as Plaintiff's "weakness."

## STANDARD

Summary judgment is proper where, viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Reich v. ConAgra, Inc.*, 987 F.2d 1357, 1359 (8th Cir. 1993). "Where there is no dispute of material fact and reasonable fact finders could not find in favor of the nonmoving party, summary judgment is appropriate." *Quinn v. St. Louis County*, 653 F.3d 745, 750 (8th Cir. 2011). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets the initial step, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby,*

13

*Inc.*, 477 U.S. 242, 248 (1986).  To satisfy this burden, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

A question of material fact is not required to be resolved conclusively in favor of the party asserting its existence.  Rather, all that is required is sufficient evidence supporting the factual dispute that would require a jury to resolve the differing versions of truth at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248-249.  Further, determinations of credibility and the weight to give evidence are the functions of the jury, not the judge. *Wierman v. Casey's General Stores, et al.,* 638 F.3d 984, 993 (8th Cir. 2011).

## DISCUSSION

### Count I: Missouri Human Rights Act - Race Discrimination - Hostile Environment

Count I of Plaintiff's Complaint alleges a hostile environment based on race pursuant to MO. REV. STAT §§213.010 *et seq.* - Missouri Human Rights Act ("MHRA"). In order to prevail on this claim she must show (1) she is a member of a protected group, (2) she was subjected to unwelcome harassment, (3) her race "was a motivating factor in the harassment," (4) "the harassment refused, withheld from, or denied, or attempted to refuse, withhold from, or deny [her] of the accommodations, advantages, facilities, services, or privileges made available in the public school, or segregated or discriminated against [her] in the use thereof on the grounds of [race]," and (5) the public school knew or should have known of the harassment and failed to take prompt and effective remedial action. *State v. Hansbrough*, 2023 WL 8721939 (Mo. App. 2023), *reh'g, trans. denied*, (Jan. 4, 2024), *trans. mo.s.ct. other grds.*, (Mar. 5, 2024) (*citing Doe by & through Subia v. Kansas City, Mo. Sch. Dist.*, 372 S.W.3d 43, 52-54 (Mo. App. W.D. 2012)).

14

The parties do not dispute that elements (1), (2), and (3) have been satisfied. The Court agrees. For element (4), Plaintiff must show that the harassment was "so severe or pervasive as to alter a term, condition, or privilege of [attending school]." *See, e.g., Duncan v. GMC*, 300 F.3d 928, 934 (8th Cir. 2002). The fourth part of a hostile environment claim includes both objective and subjective components: an environment that a reasonable person would find hostile and one that the victim actually perceived as abusive. *Id*.

To so determine the objective component, the "totality of the circumstances [should be considered], including the 'frequency of the discriminatory conduct; its severity; whether it [wa]s physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with…performance.'" *Id*. An environment that a "reasonable person would [not] find hostile" is insufficient. *Id*. Thus, the school environment must be "permeated with discriminatory intimidation, ridicule, and insult…[and] [t]he conduct…extreme in nature and not merely rude or unpleasant." *Rimson v. Amazon*, 652 F.Supp.3d 1048, 1058 (W.D. Mo. 2023) (analyzing race-based claim under the MHRA). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of [attending school]." *Id*.

Here, the evidence in the record would not permit a jury to conclude that Plaintiff experienced harassment so severe and pervasive as to deprive Plaintiff of access to the educational opportunities or benefits provided by the school in her public education.

Plaintiff claims to only be aware of the following specific events: that students J.B. and D.B. put her down because of her skin tone, told her to "go back to the cotton field," and called her the "N word;" that students J.B. and D.B. made comments such as "white power" and "Trump 2020;" and that J.B. once got down on one knee and held up the Black Lives Matter fist, but she

15

did not report these to anyone. She also claims that during an out-of-school FaceTime call that two boys said the n-word but not about her, one told Plaintiff to slit her wrists, and one said "go back to the cotton fields." Plaintiff's outside-of-school allegations were primarily directed at others and not her and were not necessarily racially based. Upon investigation by Odom, the one example of in-school conduct was denied to have taken place and not witnessed. Plaintiff's allegations are not severe or pervasive enough to clear the high threshold of showing that the alleged harassment altered a term, condition, or privilege of her attending school. The accusations are more akin to teasing, offhand comments and do not amount to discriminatory changes in the terms and conditions of attending school. *See, e.g., Davis v. Monroe Cty. Bd. of Edu.*, 526 U.S. 629, 650 (1999) ("[I]n the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education."); *also see Anderson v. Durham D & M, LLC*, 606 F.3d 513 (8th Cir. 2010) (employee being called offensive/profane names by others "as he passed by nearly every time he saw them for almost his entire employment" not sufficient to establish race-based claim); and *Davis, supra*, 526 U.S. at 652-53 (noting "unlikely that Congress…thought" that "a single instance of sufficiently severe one-on-one peer harassment could be said to…be serious enough to have the systemic effect of denying…equal access to an educational program"); and *Doe v. Dardanelle Sch. Dist.*, 928 F.3d 722, 727 (8th Cir. 2019) (two instances of sexual assault involving calling student a bitch, grabbing breast over shirt, reaching up shorts touching outside of private parts, and attempting to have student grab groin, "was not…so severe, pervasive, and objectively offensive that it c[ould] be said to [have deprived Doe] of access to the educational opportunities or benefits provided by the school"); and *cf. Willis v. Henderson*, 262 F.3d 801 (8th Cir. 2001) (placing very

racially offensive cartoon on employee's desk in conjunction with unpleasant/rude comments by coworkers insufficient).

This Court understands that "when considering whether a single use of the 'n-word' could be sufficiently severe for purposes of establishing a hostile work environment claim, other courts have recognized that 'the resolution of that question is context-specific, it is clear that one such instance can suffice to state a claim.'" *See Shamsuddi v. Classic Staffing Servs.*, 509 F. Supp. 3d 327, 338 (E.D. Pa. 2020) (quoting *Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017); also citing *Williams v. City of Phila. Office of Fleet Mgmt.*, No. 18-3875, 2020 U.S. Dist. LEXIS 60287, 2020 WL 1677667, at *4 (E.D. Pa. Apr. 6, 2020)). And it recognizes that courts in this district have left this conclusion open. *See, e.g. EEOC v. Sun Chem. Corp.*, No. 4:23-cv-00694-RK, 2024 U.S. Dist. LEXIS 201991, at *10-11 (W.D. Mo. Nov. 6, 2024) (citing *Willis v. Henderson*, 262 F.3d 801, 809 n.4 (8th Cir. 2001); *Watson v. CEVA Logistics U.S., Inc*., 619 F.3d 936, 942 (8th Cir. 2010)).

However, the facts of this case do not create those circumstances. While courts have recognized that a single severe incident may in some circumstances create a triable hostile environment claim, Plaintiff's allegations here are diffuse, non-specific, and in large part unreported to administrators. Unlike cases where the word was directed squarely and repeatedly at a plaintiff, here the record contains only one reported instance to Defendants during school hours, which was investigated and disputed (denied) by witnesses. This report was Plaintiff's only report of racial discrimination during her time at Cherokee. Every other instance Plaintiff brings as evidence is non-specific or not directed at Plaintiff.

See her April 26, 2021 email below:

17

Thank you! So whenever I walk into CSIM class (first period) D____ B____ will say "go back to the fields cotton picker" J____ M____ is one of my good friends and she is in the class also and I know D____ says it to her too. Now for the N word and etc, It honestly just depends were you are I hear it at lunch the most. I don't have specific people but that's all the information I know that happens in school. Hopefully this information helps in someway. Thanks!

For these reasons, Plaintiff has failed to present evidence that would allow a jury to conclude that Plaintiff experienced harassment so severe and pervasive as to change the terms or conditions of her public education.

While element (4) is dispositive, the Court would also grant summary judgment as to (5). Plaintiff has not shown that a jury could find that the public school knew or should have known of the harassment and failed to take prompt and effective remedial action. Back in January of 2021, Defendants were presented with concerns from teachers about issues of a racial nature. The concerns were "general" meaning that the teachers believed they needed to be addressed, rather than teachers indicating to Odom that specific comments were being made by one student to another. The teachers could not determine which student was making inappropriate comments because students were wearing masks due to COVID. Following the January 2021 reports, Illig implemented an advisory meeting program that included monthly meetings with students, that occurred at the beginning of the school year and then monthly thereafter relating to appropriate and inappropriate school conduct, as well as through individual discussions with students. Illig created slides that were used during these advisory meetings. In the January 2021 meeting, students were advised to never use words of a racial nature. In the February meeting, the slides were updated to be more explicit regarding students not using racial terms, in any context or form, to prevent such from occurring, and told students that there would be severe discipline issued to students who did so. The reports were in January 2021, and the program was implemented that same month. With the implementation of these advisory meetings and development of the material, it is clear to the Court that Defendants took prompt, effective remedial action.

18

Further, Defendants received nineteen (19) written reports of discrimination at Cherokee between November 2019 and April 2021, including six (6) after January 2021. None involved Plaintiff. Defendants' response to reports of race discrimination at Cherokee did not always include taking written statements from students. However, Odom followed up on reports regardless of whether a student provided a written statement. Defendants report fourteen (14) incidents for twelve (12) students that received discipline for engaging in conduct which Cherokee administration deemed warranted discipline.

Odom investigated the concerns that Plaintiff provided in her email on April 26, 2021 and determined that the alleged conduct did not take place. Student J.M., whom Odom determined was Bi-racial, told Odom that no one ever used racially insensitive terms or called her names. Student D.B., whom Odom determined was African American, denied that he said, "go back to the fields cotton picker." That situation was the only at-school conduct of which Defendants were made aware pertained to Plaintiff.

Defendants have shown that they implemented advisory programs after learning of general racial discrimination at Cherokee. They have also shown that they promptly investigated Plaintiff's claim of racial discrimination at school and had a practice of doing the same for all reports. Plaintiff has failed to present evidence that would allow a jury to conclude that Defendants knew or should have known of the alleged harassment and failed to take prompt, effective, remedial action

Considering the totality of the circumstances properly before the Court and viewing the evidence in the light most favorable to Plaintiff, a jury could not conclude that Plaintiff experienced harassment so severe and pervasive as to change the terms or conditions of her public education or that Defendants knew or should have known of the alleged harassment and failed to take prompt,

effective, remedial action. Defendants are entitled to judgment as a matter of law. Summary judgment as to Count I is **GRANTED**.

### Count II: Missouri Human Rights Act - Disparate Treatment

Count II of Plaintiff's Complaint alleges disparate treatment based on race pursuant to the MHRA. In order to prevail on this claim, Plaintiff must establish that: (1) she is a member of a class protected by 213.065, (2) she was discriminated against in the use of a public accommodation, (3) her status as a member of the protected class was the motivating factor in the discrimination, and (4) she was damaged as a result. *R.M.A. by Appleberry v. Blue Springs R-IV School District*, 568 S.W.3d 420, 425-28 (Mo. 2019); *Glore v. Potosi R-III Sch. Dist.*, 722 F. Supp. 3d 950, 954 (E.D. Mo. 2024). Defendants contend Plaintiff cannot show element (2), (3), or (4). The Court agrees.

#### <u>Discrimination in the Use of a Public Accommodation</u>

At all times after Plaintiff discontinued seated learning, while she was awaiting placement in Homebound, she had full access to her SPS Chromebook and could complete her assignments as she chose, even when not at school. She was also able to communicate with her teachers. Moreover, she ultimately was allowed to finish the school year in a virtual program, and advanced to the next grade. Plaintiff admits that she has continued to advance in school and enjoys school. Plaintiff has presented no evidence that Homebound was inferior. In fact, her grades in her core subjects greatly increased. Her failure in science was largely due to her failure to even attempt to complete assignments. Plaintiff was not denied any of the accommodations, advantages, facilities, services, or privileges that SPS made available. She was only denied the virtual program of her

choice. For these reasons, Plaintiff has failed to show that a jury could find that she was discriminated against in the use of a public accommodation.

### Motivation Based on Protected Class Status

While element (2) is dispositive, the Court would also grant summary judgment for element (3). No student was permitted to transfer to Launch after April 12, 2021—all virtual transfers after that date were to Homebound. Additionally, of the fourth quarter transfer requests, 54% of white student transfer requests were granted (i.e., 7 out of 13), and 46% were denied; 57% of minority student transfer requests were granted (i.e., 4 out of 7), and 43% were denied. Thus, white students fared worse than minority students. Plaintiff presents no evidence of statements or communications that cite her race as the motivation for denying her transfer to Launch. Indeed, the only proposed comparator offered– student A.L. – was denied transfer to Launch and placed in Homebound. For these reasons, Plaintiff has failed to show that a jury could find that her status as a member of the protected class was the motivating factor in the discrimination.

### Damage

Lastly, Plaintiff has failed to show she was damaged as a result of Defendants' conduct. She increased her grades in her core subjects. And even if she hadn't, she matriculated on to eighth grade and has continued advancing. In 2023, she was enrolled at Parkview High School and enjoyed school. For these reasons, Plaintiff has failed to show that a jury could find that she was damaged as a result of discrimination.

Although the Court need not reach the issue, even if Plaintiff could establish a prima facie case, Defendants have shown that the same result would have occurred regardless of her protected status. In an email dated April 7, 2021, it was relayed to staff that per Dr. Wynn, Launch transfers

would no longer be allowed due to the lateness in the year. A consideration underlying that policy was that no new schoolwork was assigned to Launch students during the latter part of the fourth quarter.

For these reasons, Plaintiff has failed to present evidence that shows that a jury could find that she was discriminated against in the use of a public accommodation, her status as a member of the protected class was the motivating factor in the discrimination, or that she was damaged as a result. Defendants are entitled to judgment as a matter of law. Summary judgment as to Count II is **GRANTED**.

### Count IV: 42 U.S.C. §1983 Free Speech Retaliation (Amend. I)

Count IV of Plaintiff's Complaint alleges free speech retaliation based on race pursuant to 42 U.S.C. §1983. In order to prevail on this claim, Plaintiff must establish that: (1) she engaged in activity protected by the First Amendment; (2) an adverse action was taken against her; and (3) her protected speech was a substantial or motivating factor in the defendant's decision. *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009). If this showing is made, the burden shifts to the [defendant] to demonstrate that it would have taken the same action regardless of her First Amendment activities. *Altonen v. City of Minneapolis*, 487 F.3d 554, 559 (8th Cir. 2007). It is clear to this Court that Plaintiff and her mother both reported race discrimination at Cherokee Middle School, and as such, have satisfied the first element. However, Plaintiff has not shown that an adverse action was taken against her or that her protected speech was a substantial or motivating factor in Defendants' decision.

### **Adverse Action**

As to the second element, Defendants contend that no adverse action was taken against Plaintiff because the decision to deny transfer to Launch was made by Dr. Wynn, not either of the Defendants, and even if Defendants took part in the decision, no adverse action was taken because Plaintiff always had access to school materials through the denial process. The Court agrees that no adverse action against Plaintiff was taken.

Plaintiff must show that Illig and Odom "took adverse action against h[er] that would chill a person of ordinary firmness from continuing in the activity." *Vollmecke v. Ind. Sch. Dist., No. 23-00644-CV-W-BP, 2024 WL 4524547*, *8 (W.D. Mo. Oct. 11, 2024) (*quoting Scheffler v. Molin*, 743 F.3d 619 (8th Cir. 2014)). "Whether a particular action would chill speech for First Amendment retaliation purposes "is an objective test: [t]he question is not whether the plaintiff [her]self was deterred ...' " *Id*. at *9. The "proper inquiry is whether [the alleged refusal based on Plaintiff's alleged report] would have chilled a person of ordinary firmness from continuing to speak." *Rinne v. Camden Cty.*, 65 F.4th 378, 384 (8th Cir. 2023). *Rinne* distinguished between "non-actionable retaliatory measures that produce only 'embarrassment, humiliation and emotional distress,' … and steps that engage 'the punitive machinery of government' to impose 'concrete consequences' in retaliation for speaking out against the government." 65 F.4th 378, 384 (8th Cir. 2023).

Plaintiff cites *Garcia v. City of Trenton* to show the distinction between mere speech and concrete consequences. 348 F.3d 726, 729 (8th Cir. 2003). The *Garcia* plaintiff, a business owner, had previously parked in front of her store in violation of a city ordinance, without incident. *Id*. at 728. Only after she objected to the city's non-enforcement of its sidewalk ordinance and had a "heated" exchange with the mayor did she begin receiving parking tickets. The mayor told her that the two-hour time limit ordinance would be enforced against her, and that he was taking this action

23

because of her complaints about the sidewalk ordinance. *Id*. The court found the evidence sufficient to show that the retaliatory issuance of the tickets, due to her complaints, would chill the speech of a person of ordinary firmness, supporting the jury verdict. *Id*.

The present case is distinguishable from *Garcia*. Plaintiff presents no evidence of concrete consequences, or threats by Defendants that would support a chilling of speech. At all times Plaintiff had access to her SPS Chromebook which gave her the ability to communicate with her teachers and complete assignments. There were no consequences for Plaintiff, unlike the parking tickets in *Garcia*. Additionally, there was no statement by Defendants showing retaliatory intent. In *Garcia*, the mayor told that plaintiff the parking ordinance would be enforced against her because of her complaints. Defendants in this case have only given one reason for Plaintiff's transfer to Launch being denied and that was due to the lateness in the year. Plaintiff has not presented any evidence of a statement that gives another reason for the denial.

Even assuming Plaintiff's version of events, the record does not establish that she suffered any adverse action within the meaning of either § 1983 or the MHRA. An "adverse action" requires a materially negative change in the terms or conditions of education. The undisputed facts show that no such change occurred.

First, Plaintiff remained continuously enrolled in SPS throughout the 2020–2021 school year. She was provided with a Chromebook and full access to Canvas, the district's learning platform, through which she could communicate with teachers, receive assignments, take tests, and submit her work. The record further demonstrates that Plaintiff was able to turn in assignments even on days she was absent from school, and her academic record reflects that she advanced to the next grade and saw improvement in her core subject grades during Homebound.

24

Second, the transition from in-person instruction to Homebound was not a deprivation, but rather a different accommodation offered to ensure her continued educational access. The short administrative period between the physician's letter and approval of Homebound was consistent with the timelines experienced by other students of all races and did not result in a denial of education.

Third, Plaintiff's allegation that she was denied a transfer to Launch does not transform the accommodation she received into an adverse action. Launch was one of several virtual options available, and the fact that Plaintiff was placed instead into Homebound does not reflect a materially negative consequence. At most, it represents a difference of preference among modalities, not a deprivation of educational rights.

The undisputed facts demonstrate that Plaintiff maintained continuous access to school resources, successfully advanced to the next grade, and received accommodations consistent with district policy. Absent an adverse action, her retaliation claim fails as a matter of law. Accordingly, on this record, no reasonable jury could conclude that Plaintiff experienced an adverse action. Defendants are entitled to judgment as a matter of law. Summary judgment as to Count IV is **GRANTED.**

### Count III: Missouri Human Rights Act - Retaliation

Count III of Plaintiff's Complaint alleges retaliation based on race pursuant to the MHRA. In order to prevail on this claim, Plaintiff must establish that: (1) she complained of discrimination, (2) Defendants took adverse action against her, and (3) a causal relationship exists between the complaint and the adverse action. *Harrison v. Harris-Stowe State Univ.*, 626 S.W.3d 843, 857 (Mo. Ct. App. 2021). A causal relationship exists when retaliation was the "motivating factor" to

the adverse action. *See* RSMo. §§ 213.010(2) and (19) (2017) ("actually played a role in…and had a determinative influence").

For the reasons listed in the above discussion on §1983 Free Speech Retaliation, this Court finds Plaintiff has failed to present evidence that shows that a jury could find that Plaintiff experienced an adverse action. Absent an adverse action, this state law retaliation claim fails as a matter of law. Defendants are entitled to judgment as a matter of law. Summary judgment as to Count III is **GRANTED.**

### Count V: 42 U.S.C. §1983 Equal Protection – Race (Amend. XIV)

Count V of Plaintiff's Complaint alleges denial of Equal Protection based on race pursuant to 42 U.S.C. §1983. In order to prevail on this claim, Plaintiff must, as a threshold matter, demonstrate that [she has] been treated differently by a state actor than others who are similarly situated simply because [Plaintiff] belong[s] to a particular protected class." *C.M.B. v. Odessa R-VII Sch. Dist. Bd. of Edu.*, No. 17-01075-CV-W-GAF, 2019 WL 13298894, *4 (W.D. Mo. March 21, 2019) (quoting *Keevan v. Smith*, 100 F.3d 644, 647-48 (8th Cir. 1996)). So, she must first identify a comparator who was "identical or directly comparable" to her "in all material respects," yet was "treated more favorably." *Borishkevich v. Springfield Pub. Sch. Bd. of Educ.*, 541 F. Supp. 3d 969, 982 (W.D. Mo. 2021) (quoting *Robbins v. Becker*, 794 F.3d 988, 996 (8th Cir. 2015)). If she makes that showing, she must then show that there is "no rational basis for the difference in treatment." *Robbins*, 794 F.3d at 995. Plaintiff does not make that showing.

The Court finds Plaintiff fails to come forward with evidence from which a reasonable jury could find that Defendants refused her transfer to Launch due to her race. Plaintiff contends that white students were granted transfers to Launch in the fourth quarter of the 2020-2021 school year,

when Plaintiff was denied because of her report of racial discrimination. While it is true that white students were granted transfers in the fourth quarter, it is also true and undisputed that minority students were granted transfers in the fourth quarter at a comparable rate.

Of the 20 fourth quarter transfer requests, student A.L. is a comparator to Plaintiff because she is white and she requested transfer to Launch for bullying. A.L.'s request (and denial) was made on March 25, 2021, a few days into the fourth quarter. Plaintiff's request came nearly a month later, late in the fourth quarter. However, Plaintiff cannot prove that A.L. was treated more favorably than Plaintiff because A.L. was also denied transfer to Launch and given Homebound as an option. For these reasons, Plaintiff fails to present a comparator who was treated more favorably than her.

Plaintiff fails to show a genuine issue of *material* fact exists as to the number of student transfer requests. The parties went back and forth on the interpretation and calculation regarding the number of student transfer requests. Upon review of the record, it is uncontroverted that of the 20 Launch transfer requests made during the fourth quarter and before Plaintiff's request. 8 requests were denied (5 white students and 3 minorities) because the students had previously been unsuccessful in Launch. As for the remaining 12 requests, except for student A.L. (white - denied), all were granted (7 white students and 4 minority students). Statistically, 54% of white student transfer requests were granted (i.e., 7 out of 13), and 46% were denied. And 57% of minority student transfer requests were granted (i.e., 4 out of 7), and 43% were denied. Including Plaintiff, there were 21 Launch transfer requests in the fourth quarter. That would make the numbers: 54% of white student transfer requests were granted (i.e., 7 out of 13), and 46% were denied. And 50% of minority student transfer requests were granted (i.e., 4 out of 8), and 50% were denied. Even at 54% and 50%, the Court does not find that difference to be indicative of racial preference, rather

27

it is comparable and refutes any inference that race was a determining factor on the transfer process. Notably, the last student that was granted a Launch transfer, on April 12, was bi-racial (student X.L.). This undisputed data regarding Launch transfer requests during the fourth quarter reveal no racial preference. At most, the record shows individualized determinations based on extenuating circumstances and student performance in Launch, not racial considerations.

Where denial rates are comparable and Plaintiff fails to identify a direct comparator that was treated more favorably, Defendants have shown that that there is no genuine dispute of material fact. Plaintiff has failed to present evidence that shows that a jury could find that race motivated any actions by Defendants. Defendants are entitled to judgment as a matter of law. Summary judgment as to Count V is **GRANTED**.

### Count VI: 42 U.S.C. §1983 Denial of Substantive Due Process (Amend XIV).

Count VI of Plaintiff's Complaint alleges denial of substantive due process in her education based on race pursuant to 42 U.S.C. §1983. In order to prevail on this claim, Plaintiff "must demonstrate <u>both</u> that the official's conduct was conscience-shocking, <u>and</u> that the official violated one or more fundamental rights that are deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Schmidt v. Des Moines Pub. Sch.*, 655 F.3d 811, 816 (8th Cir. 2011) (citation omitted) (emphasis in original). Defendants assert that Plaintiff cannot establish either element. The Court agrees.

#### <u>Fundamental Right</u>

Plaintiff possessed no fundamental right to an education platform of her choosing. "[P]arents [and students] do not have a constitutional right to manage every aspect of [a student's]

experiences in the public education system." *Borishkevich, supra*, 541 F.Supp.3d at 981. While "a student's legitimate entitlement to a public education [is] a property interest...protected by the Due Process Clause," *Goss v. Lopez*, 419 U.S. 565, 574 (1975), "the property interest which is protected…is the right to participate in the entire educational process and not the right to participate in each individual component of that process." *Stevenson v. Blytheville Sch. Dist.*, 800 F.3d 955, 968 (8th Cir. 2015) (rejecting students' "subjective expectancy of school choice" because district did not prevent students from attending public school); *also see McClelland v. Katy Ind. Sch. Dist.*, 63 F.4th 996, 1015 and n. 96 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 348 (2023) ("students are not deprived of a protected property or liberty interest when they are placed in alternative education programs" because they are "not den[ied] access to public education") (citations omitted); and *Pocono Mtn. Charter Sch. V. Pocono Mtn. Sch. Dist.*, 442 Fed. Appx. 681, 686 n.5 (3rd Cir. 2011) ("students do not have a cognizable liberty or property interest in going to a school of their choice").

Courts have long held that students who, for example, face suspensions, even for periods of time for less than ten (10) days, are entitled to due process. *See Goss v. Lopez*, 419 U.S. 565 (1975). Plaintiff likens the (10) days suspension in *Goss* to this case but these situations are factually distinct and Plaintiff's reliance on *Goss* is misplaced. In *Goss* the students were suspended as a disciplinary procedure due to their disruptive behavior during school. In this case, Plaintiff chose to discontinue seated learning on her own; she was not suspended. While her approval into Homebound and ultimate placement did result in a processing delay (12 days) it did not deny her an education. Plaintiff's assignments were frozen on the last date she attended seated learning, and she maintained use of her Chromebook, access to her prior assignments and was given ample opportunities to submit incomplete assignments. Further, Plaintiff ultimately

increased her grades in her core subjects and advanced to eighth grade. Plaintiff did not experience a "gap" in education as she argues. She was simply denied the virtual platform of her choice.

### Conscience-Shocking Conduct

Further, Plaintiff has not shown that the alleged conduct was conscience shocking. For an infringement to "shock the conscience," it must amount to "arbitrary government action and egregious misconduct." *Schmidt v. Des Moines Pub. Sch.*, 655 F.3d 811, 817 (8th Cir. 2011). Illig and Odom's conduct was neither arbitrary nor egregious and Plaintiff has presented no evidence that creates a genuine dispute as to that finding. Illig and Odom took appropriate steps by consulting with Dr. Wynn to determine the options available for Plaintiff when she no longer desired seated learning and coordinated those efforts with Health Services. Her transfer was denied due to the lateness in the school year. That decision was not arbitrary. Dr. Wynn communicated to staff via email in early April that no more transfers would be allowed due to the time of the year.[6] A consideration for not being allowed to transfer to Launch at that time of year included the fact that Launch students were assigned no new schoolwork during the latter part of the fourth quarter. This Court finds that Defendants have shown that there is no genuine dispute of material fact and Plaintiff has presented no evidence that shows that a jury could find that race motivated any actions by Illig or Odom. Defendants are entitled to judgment as a matter of law. Summary judgment as to Count VI is **GRANTED**

### Qualified Immunity

---

[6] The Court recognizes three transfers were allowed on or after April 7, 2021. Those transfers consisted of one white student, one Hispanic student and one bi-racial student. This evidence does not create a material dispute. Rather it goes to show race was not a motivating factor in fourth quarter transfer decisions.

The Court finds Defendants' efforts reasonable. However, the Court having resolved the issues above need not consider the issue of qualified immunity in this case.

## CONCLUSION

Viewing the evidence in the light most favorable to Plaintiff, the Court concludes that no genuine dispute of material fact exists as to any of Plaintiff's claims. The undisputed record establishes that Plaintiff remained continuously enrolled, retained access to school resources and accommodations, and advanced academically during the relevant period. The evidence does not support a finding of materially adverse action, disparate treatment, or intentional discrimination. Nor does it demonstrate conduct so severe or pervasive as to alter the conditions of education, or any deprivation of substantive due process rights.

While this Court enters judgment for the Defendants it recognizes the nature of the racial comments students confronted randomly in the hallways at Cherokee Middle School. Such offensive comments are always repulsive. To the extent students thought them funny or clever— they were neither. They were mean and hurtful. The circumstances at the school tragically demonstrate the racial hatred and bigotry this country has known from its origin remains. Sadly, it appears it has been passed on to and manifested itself in too many from still a new generation. Young people learn this behavior somewhere—at home, on television, or social media. It is not taught at school and should not be witnessed there. We are not born with such prejudices or bias. We can only hope that as this generation of young lives and grows older it will come to understand the disastrous dead end to which bigotry and prejudice leads. Too many from past generations have failed to learn the lesson. In the meantime, our schools – confronted with consequences of long standing and continuing racial hatred resulting from both explicit and

implicit bias – must continue to teach, educate, inform, and discipline.  Here administrators made a reasonable effort to do each. Schools through our educators must keep trying.

Because Plaintiff has failed to meet her burden on each claim, Defendants are entitled to judgment as a matter of law. Summary judgment on all counts is **GRANTED**.

**IT IS SO ORDERED.**

Date: September 16, 2025                          /s/ Douglas Harpool
                                                 **DOUGLAS HARPOOL**
                                                 **UNITED STATES DISTRICT JUDGE**